JUAN SILVA TORO, Plaintiff and Appellant, v. HEIRS OF CELESTINO CARATINI ZAYAS, Defendants and Appellees.

No. 7159.   Argued March 11, 1937.—Decided June 18, 1937.

*R. Atiles Moréu* and *A. de Jesús Matos* for appellant.   *Agustín E. Font* for appellees.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

This is an action for the recovery of money paid by mistake (*cobro de lo indebido*).   Two causes of action are set up in the complaint.

The basis for the first cause of action is that the plaintiff, being the owner of an ice plant and wishing to operate the same by electric power, was about to enter into a contract with the Bureau of Utilization of Water Resources of the Insular Government when Celestino Caratini, the predecessor in interest of the defendants, intervened, and, claiming that he was the owner of an exclusive franchise for the sale of electric power and lighting in Coamo, stated to the

plaintiff that the contract which he intended to make could not be carried into effect without his consent, and in order to give the same he demanded the sum of twenty dollars monthly. The plaintiff, believing that this was so, agreed to such demand and even made seventy-two monthly payments, the truth being that during all that time Caratini did not own any franchise authorizing him to sell the electric power used by the plaintiff nor to demand any extra charge, the contract made being without consideration.

The second paragraph setting forth the second cause of action, textually transcribed, reads as follows:

"That after Celestino Caratini died, the defendant heirs, claiming to be the assignees of the supposed contract referred to in the first cause of action, collected from the plaintiff the sum of $20 for the month of February 1933, without authority therefor and without there being any valuable consideration to support such payment, which was induced by the false pretenses made by the predecessor in interest of the defendants at the inception of the alleged contract in the month of October 1926."

Prayer is made for a judgment containing the following pronouncements:

"(a) Celestino Caratini unduly collected, and the plaintiff unduly paid to him, the sum of $1,440.

"(b) The heirs of Celestino Caratini unduly collected, and the plaintiff unduly paid to them, the sum of $20, and in their turn said heirs have inherited from Celestino Caratini, their predecessor in interest, the obligation to restore and reimburse to the plaintiff the sum of $1,440 plus the sum of $20 collected by them, which they are directly bound to pay."

The defendant heirs interposed a demurrer to the complaint on the ground of insufficiency which was argued and overruled. Thereupon they answered and denied generally and specifically all the averments of the complaint. The case went to trial. Both parties introduced their evidence, and on May 25, 1935, the court rendered judgment for the defendants, without special imposition of costs.

The court, in the statement of the case and opinion which formed the basis of its judgment, weighed the evidence introduced as showing that "in or about the year 1926 the plaintiff Juan Silva Toro owned an ice plant in Coamo which was operated by means of petroleum, and wishing to install a 15-horsepower electric motor to replace the petroleum motor, he agreed with Celestino Caratini, the predecessor in interest of the defendants, to whom a franchise (originally issued to Ramón Gandía Córdova) for the sale of electric power and lighting in Coamo had been granted by The People of Puerto Rico, that Caratini should procure the installation of the new motor from the Carite Irrigation Service; that Caratini entered into a contract with said Irrigation Service for the installation of the said motor for the ice plant (Plaintiff's "Exhibit 10"), and said contract appears to have been executed in the name of Caratini; that the plaintiff paid $300 for the installation of the transmission line leading to the ice plant and also the amount of the monthly consumption of electric power, plus $20 a month to Caratini for having consented to the invasion of the territory of Coamo, which according to his theory was exclusive under the terms of the franchise he owned; that the plaintiff made the monthly payments to Caratini and the latter to the Irrigation Service; that these payments were made from November 1926 to January 1933, the last payment having been made to the defendant heirs due to the death of Caratini; that upon being informed that Caratini did not own such exclusive franchise for the territory of Coamo, the plaintiff made a direct contract with the Irrigation Service in March 1933 for the supply of electric power for his ice plant."

The court went on to state that the decisions of this Supreme Court hold that one who makes a payment by mistake may sue for its recovery if the mistake is one of fact, but not if the mistake is one of law; and it cited *Arandes* v. *Báez*, 20 P.R.R. 364; *American R. R. Co. of P. R.* v. *Walkers*, 22

P.R.R. 264; *Suc. of Marín* v. *Municipality of Arecibo,* 28 P.R.R. 477.

The court transcribed outstanding paragraphs of the opinions delivered in two of the cases cited, and referring to the last one—*Suc. of Marín* v. *Municipality of Arecibo*—said:

"We think that the facts in the case we have just cited are very similar to those of the instant case. The determination as to whether or not the franchise owned by Caratini was an exclusive one for the territory of Coamo, and as to whether he was entitled to collect from the plaintiff the $20 a month by virtue of said franchise or on account of his intervention in the business, is not a question of fact but of law. In the instant case, as in that of Suc. of Marín, the plaintiff had knowledge of the fact which gave rise to the payments, and the subsequent knowledge acquired by him that said payments were unnecessary or improper because Caratini originally, and the defendants subsequently, lacked the right to collect the same, can not be considered as a mistake of fact but as one of law. Therefore we hold that, according to section 1795 of the Civil Code, the plaintiff has not proved that he is entitled to recover on his claim."

It further said:

"As to the theory that the case may fall within the provisions of section 1227 of the Civil Code, the court is of the opinion that it has not been proved that the contract entered into by the plaintiff and the predecessor in interest of the defendants was one without consideration or based on an illicit consideration, taking into account that Caratini, the predecessor in interest of the defendant heirs, made the contract with the Irrigation Service in his own name, thus directly assuming all the liability as to said Service; that the plaintiff derived some benefit by changing the system of motor power under which the ice plant was operated; that Caratini had paid a part of expenses incurred in the installation of the line which supplied electric power to the plant, inasmuch as said power was taken from the line which had been previously constructed by the Irrigation Service and Celestino Caratini; and lastly, that Caratini was directly responsible to the Irrigation Service for the monthly payment of the current used by the ice plant. It cannot be said that in a contract of this character, there was no consideration or that the same was illicit."

Feeling aggrieved by that judgment, the plaintiff appealed. He has assigned in his brief two errors committed, as he claims, by the court in holding that there was involved a mistake of law and not of fact, and that the contract was executed for a valuable and lawful consideration.

In order to form a correct judgment, let us see how the facts appear from the evidence.

The first witness to testify was the plaintiff himself. He stated that for many years he had been exploiting an ice plant operated until 1926 by means of petroleum. Then, to quote from his testimony, "I thought of installing an electric motor, and I had told about it to some persons. I thought of taking steps for that purpose, but one afternoon, during the early part of May, Caratini, now deceased, came to me and inquired whether it was true that I was getting ready to install an electric motor, and I told him yes. Then he told me, 'if you are thinking of installing an electric motor, you will have to do so through me.' I said, 'Well, it makes no difference to me,' and he replied, 'Then I am going to request the Irrigation Service to send you an expert here.' I told him, 'I have no objection either.' Some days afterward a gentleman from the Irrigation Service came here and made some calculations. I had to pay $156.25 monthly. Besides I was bound to pay for part of the installation. Three hundred dollars for the wires, the posts, and the transformers. The installation was made by the Government. They made the connections from the back part, the place from which connections are made for lighting purposes. Such installation was not derived from the distribution plant of Caratini. The posts which supported the transmission line extending to my ice plant were erected by the Government and me. Caratini had absolutely nothing to do with it. Once the electric motor was installed and the line constructed, I expected that I would be supplied with electric current, but days and months elapsed, and the current was not supplied.

Then, one day, Caratini was passing by and I asked him why was not the current being supplied. 'Ah! because if you do not pay me for allowing the Irrigation Service to supply you with current, you will not receive it.' As I had always believed in Caratini's liberality, had dealt with him on other occasions, and had always considered him as a gentleman like myself, I, of course, did not doubt that he was telling me the truth, and then I agreed to pay twenty dollars monthly, which was the amount that he demanded from me in order that the Irrigation Service might supply me with current. That $20 was in addition to the $156.25 which was the cost of the power service. It was for Caratini. He claimed that by no means could the Irrigation Service supply me with power if he did not allow said Service to do so. I continued to pay the extra charge for seventy-two months, the total amount paid being $1,440. I stopped making such payments because one day, while talking to a person versed in franchises and like matters, said person informed me that Caratini was not entitled to collect anything from me, since that service was rendered directly by the Irrigation Service; and thereupon I paid the last receipt of December, 1932, and when February came, I did not send any money to pay the receipt; I only sent the check of the Irrigation Service, but not that of Caratini, whereupon they did not ask why I did not send it nor anything at all. Then, in view of their attitude, as they did not even attempt to collect from me, I became convinced that in fact the money had been unduly collected from me and here I am claiming that money unduly paid.''

That is the version of the plaintiff. That of the defendants is offered by Jaime Francisco Caratini, the son of Celestino, who testified that ''at the beginning of 1926 Silva came to request electric current from the Coamo plant, which belonged to my father, and father told him that he would have to write to the Irrigation Service asking permission as he did not have enough power for a 15-horsepower electric

motor; that after father wrote to the Irrigation Service and had an answer from it, they agreed that father would make a contract with the Irrigation Service in his own name, and that Silva would pay the same price for the power supplied by the Irrigation Service, and that Silva would pay father $20 for the latter's right to use the electric power and for his liability to the Irrigation Service in case of Silva's failure to satisfy the amount due. Whenever any interruption occurred, Silva would call us home by the telephone and we would call Santa Isabel, and the Irrigation Service would come to restore the Service. Silva made his payments since the beginning of the contract until one month before father's death.'' The witness remembered that his father told Silva that he would consent to the invasion of his territory if Silva would give him that twenty dollars.

The evidence shows that Caratini did own a franchise obtained by Ramón Gandía Córdova to construct and operate an electric plant in Coamo in connection with the Hydroelectric Service of the Insular Government, and that he did operate said plant at the time the facts referred to in the testimony of Silva and Caratini took place; and the evidence further shows that by virtue of an independent contract with said Hydroelectric Service of the Insular Government, Caratini obtained the supply of electric power for the ice plant of Silva, the latter sending to the former two checks monthly, one for the Government, which Caratini forwarded to its destination, and the other for $20 for Caratini himself. It seems advisable to transcribe the following letter from Caratini to Silva, which appears in the record. It reads thus:

''C. Caratini—Farmer—Box 114—Coamo, P. R.—January 21, 1927.—Mr. Juan Silva—Addressed—Dear fr'end: I take pleaure in enclosing the receipt from the Irrigation Service, which was duly paid by the check that you sent me for that purpose. At the same time, I am enclosing my receipt for the amount corresponding to the month of December.—Thank you for everything.—Very truly yours; —(Sgd.) Celestino Caratini.''

One of Caratini's receipts for twenty dollars is as follows:

"Received from Juan Silva Twenty Dollars—For current used at the Ice Plant, according to receipts from the Irrigation Service, up to the 20th of this instant month.—Coamo, December 31, 1926—$20.00.—(Sgd.) Celestino Caratini."

Did Caratini have a right to collect that twenty dollars monthly? According to the franchise he had no such right. That is clear, but there is a testimony in the record, that of Mr. Luchetti, Chief Engineer of the Irrigation Service of the Insular Government, which must be examined so as to judge Caratini's conduct. Said testimony is extensive and difficult to summarize. In our opinion, it states, in short, that up to 1927 the policy of the Government had been to leave the supply of any amount of power in the urban zone to the grantees of franchises such as that of Caratini. After that date, contracts for more than three horsepower were to be made directly with the Insular Government.

That being so, and the agreement between Caratini and Silva having been made in 1926, the statement of Luchetti is in favor of Caratini, inasmuch as the policy of the Government in 1926 was in harmony with the representations made to Silva in the said year. We have already expressed that the franchise in itself did not favor Caratini. By the terms thereof, Caratini had no right to prevent the transaction in a case like that of Silva from being made directly between the Government and the interested person. That this was so is shown by the very same independent contract made by Caratini and the Government to serve Silva.

Now, then, under those conditions, can it be concluded that Caratini made a false pretense to Silva when the agreement was made? A doubt arises as to this, but we think that really such a grave conclusion can not be reached. If the Government itself followed the policy described by Luchetti, there is nothing strange in Caratini's taking advan-

tage thereof. Nor can the possibility be excluded that, construing his franchise in good faith, Caratini might have believed that the right was on his side.

As to this first part of the transaction, under the above-stated circumstances, the mistake made must be concluded, in our opinion, to have been one of law, and hence the plaintiff can not recover what he paid, in accordance with the decisions of this same Supreme Court cited by the district judge in support of his judgment.

Now, should the situation be regarded as having remained unchanged from 1927 on, after the Government, as Luchetti himself testified, had made its new policy clear, and it was expressly directed that in cases like the present one, the grantee of the local lighting and power service would not have any exclusive right and that the contracts were to be made directly between the interested parties and the Hydro-electric Service of the Insular Government?

In our opinion, from that time on, the only circumstance compatible with the good faith of Caratini in demanding from Silva the monthly payment of $20 involved, ceased to exist. The contract made for Silva between Caratini and the Irrigation Service was for three years counted from June 9, 1926, and it was to continue in full force thereafter until written notice of the desire to terminate it should be given by either of the parties sixty days in advance.

It seems to us that the initial good faith, the mistake of law, should produce its effect, at most, until June 9, 1929, when the three years of the contract expired. After that date, the attitude of Caratini had no justification whatsoever. He knowingly continued to keep up a groundless situation, taking advantage of Silva's ignorance of the real facts in order to continue receiving from him the said sum. It is not possible to protect under the law, to legalize, such an act. And in this connection it seems advisable to say that the evidence does not show that Caratini performed any act ben-

eficial to Silva during that time; that the expenses incurred in the installation were paid by Silva and the Government, the line—posts, wires, etc.—remaining the property of the Government; that if anything was used from the original line constructed by Caratini and the Government for the lighting service rendered by Caratini in the city of Coamo, it was used when that line had already become the property of the Government in accordance with the contract; and that Caratini did not have to give any bond nor to make any payment for Silva, who remitted to him in due time all the checks which Caratini forwarded to the Government.

The case is on the border line, and it seems to us that, taking into account all the interests involved, and construing the law and the decisions with a view to do justice, the right solution is to reverse the judgment appealed from, substituting it by another one decreeing the refund of the amount unduly paid from June 9, 1929 to January 1933, namely, $853.33 for forty-two months and twenty days, without special imposition of costs.

Mr. Justice Córdova Dávila took no part in the decision of this case.